## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MICHAEL KEETON, et al.,                    :

                 Plaintiffs,        :

                                     Case No. 2:09 CV 1085

      vs.                             :

                                       JUDGE MARBLEY

TIME WARNER CABLE, INC., et al.         :

                                     MAGISTRATE JUDGE DEAVERS

               Defendants.         :

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGES

I.    **SUMMARY**...................................................... 1

Fair Labor Standards Act (FLSA), 29 U.S.C. § 201............................ 1

29 C.F.R. § 791.2.................................................................. 1

II.    **FACTS**.................................................................. 2

A. THE NATURE AND DEGREE OF CONTROL OF THE EMPLOYEE  2

(1)    **The Installation Contract Between TWC and Reno Services....**  2

a.) **The contract sets forth in great and specific detail Reno's
duties as a TWC contractor**............................................  2

b.) **The Contract Established Significant Control over Reno
Services and its Contract Installers**.................................  3

c.) **The Contract dictated how Reno Services hired
and screened new installation employees**.........................  4

d.) **TWC dictated the essential employment terms and
conditions for Reno Services' installation employees,
including pay**..............................................................  6

i.) **Section IV, EMPLOYEE REQUIREMENTS**...................  6

ii.) **Section VIII, STANDARDS AND CODES OF CONDUCT.**  7

iii.) **Section IX, WORK ORDER COMPLETION,
RECONCILIATION AND PAYMENT**............................  8

iv.) **Section XIV, NON-COMPETE**.................................  9

v.) **Other contract provisions**.......................................  9

(2) **The Work Day and Experiences of Contract Installers**..............  10

a.) **Plaintiffs report to TWC facilities in the morning, and are
dispatched to specific jobs by TWC**.................................  10

**b.) During the Day, Plaintiffs' Work is Monitored and Supervised by TWC Personnel**...................................... 12

**c.) Quality Control Inspectors Were Active Supervisors of Plaintiffs' Work**........................................................ 16

**d.) Other TWC Personnel Gave Instructions to Contract Installers**................................................................ 19

**(3)     TWC Exercised the Right to Hire and Fire Contract Installers**.. 19

**(4)     TWC was a Significant Investor in the Equipment and Facilities Used by Contract Installers**............................... 21

**(5)     TWC Owned the Property and Facilities where the Contract Installers Worked**............................................ 22

**(6)     The Permanency and Exclusivity of the Employment**............ 22

**(7)     Contract Installers Could Not Control Profit and Loss**........... 24

**(8)     Job Training was Minimal, and Some of it was done by TWC**................................................................. 24

**III.     ARGUMENT**................................................................ 26

**A.     A Totality of Circumstances Standard Determines Whether TWC Is a Joint Employer under the FLSA**................................. 26

*Anterior v. D & S Farms*, 88 F.3d 929, 929 (11th Cir. 1996) ........................... 26, 27

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)........................ 26

*McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (*per curiam*)......... 26

*Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).......... 26, 31

*United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945)........................... 26

*Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947)........................ 27

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)........................ 27

*United Stated Dept. of Labor v. Cole Enter., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995).. 27

*Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2nd Cir. 1999)............ 27

*Lopez v. Silverman*, 14 F.Supp.2d 405, 414 (S.D.N.Y. 1998)............................ 27

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).................27,29 30,32,36

*Skills Dev. Serv., Inc. v. Donovan*, 728 F.2d 294, 300 (6th Cir. 1984)................. 28

*Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir.1997)............................... 29

*Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No.1937 v. Norfolk S. Corp.*,
927 F.2d 900, 902 (6th Cir. 1991).......................................................... 30

*Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1318 (S.D.Fla. 2001)................ 30, 35

*Zhao v. Bebe Stores, Inc.*, 247 F.Supp.2d 1154, 1155 (C.D.Cal. 2003)................. 31

*Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)................................... 31

*Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983)................. 31

*Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986).......... 31

*Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 408 (7th Cir. 2007)........ 31

*Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1209
(11th Cir. 2003)............................................................................. 32

*Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987)............................... 32

*United States v. Arvizu*, 534 U.S. 266, 274 (2002)..................................... 32, 33

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997)  33

**B.      On the Voluminous Facts Developed by the Contract Installers Summary
         Judgment May Not Be Granted to TWC**..................................... 33

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)................................. 33

*Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003)............................... 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)...... 33, 34

*Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993)......................... 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)............................ 34, 35

*Wexler v. White's Fine Furniture, 317 F.3d 564, 578 (6th Cir. 2003)(en banc)*...... 34, 46

*Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978)................................. 34

*Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007)......... 34

*Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003)............................... 34

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-60 (1970)......................... 34

*Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001)...................... 34, 35

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)............................ 35

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)............................. 35

     **1.**     **No Single Factor in the Totality of the Circumstances Is Dispositive**................................................................ 35

*Mendoza v. Essential Quality Constr., Inc.*, 691 F.Supp.2d 680 (E.D.La. 2010)... 35

     **2.**     **TWC Insinuated Itself So Far Into the Performance of the Contract Installers' Job Duties that It Became a Joint Employer under the FLSA**.................................................................. 37

*Jacobson v. Comcast Corp.*, 2010 WL 3769120 *4 (D.Md. 2010)................. 37,38,39,43,45

     **3.**     **TWC's Emphasis on Separate Corporate Existence Addresses a Threshold Premise for Joint Employment and Does Not Refute a Genuine Issue of Material Fact Given the Nature of the Detailed Control TWC Had**................................................... 43

*Herman v. Mid-Atlantic Installation Serv.*, 164 F.Supp.2d 667, 672 (D.Md. 2000).. 43, 44

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2nd Cir. 2003)........................ 45

**IV.**     **CONCLUSION**................................................................. 46

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MICHAEL KEETON, et al.,           :

           Plaintiffs,           :

                            Case No. 2:09 CV 1085

    vs.           :

                            JUDGE MARBLEY

TIME WARNER CABLE, INC., et al.           :

                            MAGISTRATE JUDGE DEAVERS

           Defendants.           :

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I.    SUMMARY**

Independent contractors are exempt from the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* Consequently, an employer has no overtime and minimum wage obligations toward an independent contractor. When, however, an individual is jointly employed by the principal and the independent contractor, joint and several liability attach to each employer. The FLSA recognizes that individuals can be employees of more than one employer, and the totality of the circumstances is used to determine the fact-intensive issue of a joint-employment relationship. 29 C.F.R. § 791.2.

Time Warner premises its Motion for Summary Judgment on the absence of a joint-employer relationship to the Plaintiffs, referred to in this memorandum as "Contract Installers." Time Warner's burden is to demonstrate that no genuine issue of material fact exists on the joint-employment relationship.

Voluminous facts have been developed through depositions and documents production about the actual relationship Time Warner has with the Contract Installers. Those facts preclude

1

granting Time Warner's motion because under the totality of the circumstances, the day-to-day management control these facts demonstrate exemplify joint employment under the Department of Labor Regulation.

## II. FACTS

A note on citations: the individuals who worked installing Time Warner's cable, internet and digital phone service in Time Warner Cable customer homes and were employed by Reno Services, LLC are referred to as "Contract Installers". (The regular "W-2" employees of Time Warner doing installation work are referred to as "TWC Techs".) Defendants Time Warner Cable, Inc. and Time Warner Cable, LLC are referred to herein as either Time Warner or "TWC". Depositions in the record are referred to by name and page number, e.g.: (Denney, 53) for the deposition of plaintiff Thomas Denney, at page 53.

### A. THE NATURE AND DEGREE OF CONTROL OF THE EMPLOYEE

### (1.) The Installation Contract Between TWC and Reno Services

The Installation Contract ("Contract") between TWC and Reno Services was intended to "define the relationship" between TWC and Reno Services. (See Ex. 28, TWC000201; Reno, 120). The contract is a TWC drafted "standard" form, and no negotiation is possible. (Cavender, 135-136) TWC had the right to insist that Reno Services follow any term of the Contract. (Cavender, 174, 175)

#### a.) The contract sets forth in great and specific detail Reno's duties as a TWC contractor

The contract sets out the basic duties of Reno Services, LLC. First, is to install "cable, fittings, material and equipment, as well as provide education on services, from TWC's telecommunications system" to each TWC customer. (Ex. 28, TWC000202) Second, is to execute all word orders "in accordance with TWC's installation specifications, guidelines, and

2

standards, ('TWC Mid-Ohio Installation Guidelines' and 'Time Warner Mid-Ohio Installation Standards') as set forth in Exhibit 'C' and 'G'[1] together with any other standards imposed by TWC from time to time…"  (See Ex. 28, TWC000202)

The third duty is to follow TWC's "standards/guidelines for the assessment, routing, installation and completion of work as set forth in Exhibit 'C' and 'G'.  TWC dictated that "failure to comply with these guidelines shall result in the assessment of penalties, as more specifically set forth in Exhibit 'F'.[2] (See Ex. 28, TWC000202) Darrell Reno noted that TWC could penalize his installation employees, and that if they did so, he would charge the installer. (Reno, 237-239)

A fourth duty is to permit TWC to Quality Control ("QC") Reno's installation employees by the same standards set out by TWC; agree to receive a TWC work quality score given by TWC "based on the QC review performed by TWC" that will determine  " what percentage of future work must be inspected by [Reno's] internal QC process."; provide the required QC inspection documentation to TWC on a weekly basis; and, meet with TWC "no less than monthly, to discuss [Reno's] performance under the terms of the Agreement."

### b.) The Contract Established Significant Control over Reno Services and its Contract Installers

The Contract, in Section II, RELATIONSHIP OF THE PARTIES, contains numerous provisions that establish TWC's control over Reno Services.   This includes TWC's Right to Withdraw an Installation Employee's Assignment of TWC Work. (Ex. 28, TWC000203) TWC "shall exclude any such individual(s) from performing any duties for TWC", any installer "in its sole and absolute judgment and discretion." (Ex. 28, TWC000203) This "at-will" relationship

---

[1] Exhibit C & G were exhibits to the Contract; they are listed as Exhibits 28 and TWC000225-TWC000238 and Exhibit 2, TWC 0004590-TWC0004505 respectively in Plaintiffs' Appendix Doc. No. 79.
[2] Exhibit F was an exhibit to the Contract; it is listed as Exhibit 28, TWC000241-TWC000252 in Plaintiffs' Appendix Doc. No. 79.

was demonstrated when Plaintiff Tom Denney asked to leave work to care for his sick child. At first, Denny was told by co-workers that he had been fired by TWC. On May 18, 2008 Denny wrote to Carl Morgan asking about the status of his job. Morgan responded:

> Tom, at this point in time, it is not up to me if you still have a job
> or not. Darrell [Reno] waiting to see what Time Warner has to say.
> I know you will not be working this week.

(Plaintiff's Ex. 50, Morgan, 210-212; See generally, Reno, 251-254) Later, Reno wrote to Denney; "Tom, good news. You can still work for Time Warner." (Plaintiff's Ex. 50, 51, 52, 53, Reno, 256-257) Reno also admits to "excluding" one of his installation employees, Clayton Baxter, when TWC reported poor quality inspections. (Reno, 248-249) When asked if the effect of TWC's Quality Control excluding Mr. Baxter from TWC work was really a termination from Reno Services, Reno said yes, "we had to terminate him because I had no other work for him." (Reno, 249-250) If TWC told Reno that he couldn't use a particular installer for installs in his service area, then the installer could not work in the TWC system. (Morgan, 105-108) Similarly, Plaintiff Josh Carter was terminated at TWC's behest, because he took time off to attend his Aunt's funeral. (Carter, 43, E. Taylor, 78, S. Taylor, 38)

Reno Services installers had to wear TWC ID badge at all times. (Ex. 17; Reno, 159-161; Hoover, 83) Only TWC could issue the badge. (Reno, 224) The Contract requires (using the word "shall") that Reno Services identify itself, and its installation employees as an "authorized representative of TWC for the Work and other services covered by this Agreement." (Ex. 28, TWC000204) The Contract specifically limits the circumstances in which Reno Services can "identify itself as an independent business." *Id.*

### c.) The Contract dictated how Reno Services hired and screened new installation employees.

No Reno Services installation employee could work for TWC without obtaining a TWC ICOMS technician number ("tech number"). (Ex. 28, TWC000204; Reno, 263) To get a tech number, Reno Services had to complete and submit a TWC MIS Security Request Form ("MIS Form") for each Reno Services installation employee. *Id.* In order to begin work for Reno Services as a cable installer TWC had to approve the MIS Form. *Id.* Reno Services was also required by TWC to "conduct drug and alcohol screenings, national criminal background checks and a driving history screenings" before the Reno Services installation employee was given any work. (Ex. 28, TWC000204; Reno, 264-265) The contract also provided that "TWC may reject the assignment of any individual who does not satisfy TWC's requirements with respect to screenings. (Ex. 28, TWC000204) (Emphasis added) TWC had "no obligation to review the screenings and failure to do so shall impose no obligation on TWC." *Id.* If Reno Services wanted to hire an installer with a criminal conviction, TWC would not allow it, "there's no exceptions." (Cavender, 158)

TWC presents at page 9 of its memorandum as established fact that it never interviewed prospective employees of Reno Services, did not determine how many Contract Installers should be hired, and did not participate in those hiring decisions. The testimony cited by TWC is ambiguous. The deposition of E. Taylor, 78, actually was that he lacked knowledge in some regard and, at 10-12, knew that TWC had approved some hiring; S. Taylor, 10-13, did not know about whether TWC interviewed, but, at 10-13, shared the same understanding that TWC had approved some hiring. Keeton, 12-14, also testified that he did not recall whether he spoke with TWC but he did know that new hires had to be acceptable to TWC. (See Section (A)(3) below)

**d.) TWC dictated the essential employment terms and conditions for Reno Services' installation employees, including pay.**

In five sections[3] of the Contract TWC dictated the essential employment terms and conditions for Reno Services' installation employees. It was Reno Service's policy that if a Reno Services installer violated TWC policy that they would be terminated. (Morgan, 163) (Contrary to TWC's assertion at page 8 of its memorandum that Mr. Reno testified it had never instructed him on how to manage his business or his employees, Mr. Reno's actual testimony was it was "not the way I run my business." (Reno, 15, 296-87))

**i.) Section IV, EMPLOYEE REQUIREMENTS**

The Contract required that Reno Services designate a Safety Officer who would be responsible for a training of all of Reno Services personnel who was required to hold meetings with an agenda and take minutes. (See Ex. 28, TWC000205) TWC set the method of payment in Exhibit D to the Contract. Id. TWC mandated that Reno Services provide a ready reserve of installers. *Id.* TWC mandated that Reno Services installers "shall have direct communications with TWC." *Id*. TWC mandated that Reno Services provide installers that would work "in excess of 8 hour workdays and Saturdays and Sundays." *Id.*

TWC required that Reno Services make their installers' vehicles "clearly to identify the vehicles as being used by persons working for TWC." (See Ex. 28, TWC000206) Darrell Reno testified that he received a call from Edie Adams at TWC, requiring him to use magnets on his trucks that said "Contractor for Time Warner Cable, Reno Services, LLC". (Reno, 102-103)

TWC mandated that if Reno Services needed "materials to perform work for TWC" that he would have his installers "request all necessary materials by completing a manual material

---

[3] Sections IV, EMPLOYEE REQUIREMENTS; VIII, STANDARDS AND CODES OF CONDUCT, IX, WORK ORDER COMPLETION, RECONCILLIATION AND PAYMENT; X, EEO AND AFFIRMATIVE ACTION STANDARDS; and , XIV, NON-COMPETE.

requisition form." (See Ex. 28, TWC000206) TWC but it reserved "the right to dictate the materials issued to [Reno Services] relative to its material usage standards." (See Ex. 28, TWC000206)

### ii) Section VIII, STANDARDS AND CODES OF CONDUCT

TWC not only dictated to Reno Services the standards and code of conduct of Reno Services installers; it set out a detailed "Installation Guideline" that the Reno Service installers had to follow. (See Ex. 28, TWC000208) The Installation Guideline showed the Reno Service installers how they can "best represent TWC and himself/herself." (See Ex. 28, TWC000227) TWC instructed the Reno Services installer that his or her appearance and the appearance of his or her truck "was an important aspect of public relations" with TWC's customers. *Id.*

TWC mandated that Reno Services follow its Contractor Uniform Policy because Reno Services "[i]nstallers are a direct representation of TWC...." (See Ex. 28, TWC000228; Reno, 151) Violation of TWC's Contractor Uniform Policy would be met with severe consequences to the installer and Reno Services. TWC would contact Darrell Reno and "instruct [him] to pull the installer's route and redistribute it...and the installer will not be allowed to continue their route until deemed in compliance." *Id.* Darrell Reno wanted his employees to "absolutely" comply with the contract:

> 19 Q. Did your employees follow those rules?
> 20    MR. OZMER: Object to form.
> 21 Q. To your knowledge.
> 22 A. To my knowledge, they complied with these.
> 23 Q. Did you want your employees to comply?
> 24 A. Absolutely.

(D. Reno p. 148) Reno Services was subject to "routine, unannounced visits at [his] business locations, as well as job sites, to ensure this policy, and other polices are being enforced." (See, EX 28, TWC000229)

7

Reno Services installers had to ensure a "good personal impression" before it knocked a TWC customer's door because the "installer is a representative of TWC." *Id.* Reno Service installers were a "key link to first impressions of TWC and TWC's products and services. The initial installation may be the only face-to-face interaction with the customer until there is a problem with their service." *Id.*

The Contract also provides:

> It is the intention of TWC to stop the [Reno Services] installer from leaving any job incomplete. Effective immediately, any installer who leaves a job incomplete for any reason, without supervisor verification and approval from the TWC Installation Department, will be fined $750 dollars, plus the loss of the job, and any payments due in association therewith, upon TWC verification.

(See, Ex. 28, TWC000237).

The Contract also required exclusion for not meeting standards. (See, Ex. 28, TWC000203; Reno, 242-244) Darrell Reno testified that, "if [a Reno] employee is not doing work that's satisfactory to Time Warner that they cannot work in the Time Warner system." (Reno, 244) If a Reno Services installer was having trouble finishing a job within schedule they could call Carl Morgan, but they could also call TWC supervisors, April Blanton or TWC lead tech, Kevin Wilson. (Reno, 294-295; TWC002662)

### iii.) Section IX, WORK ORDER COMPLETION, RECONCILIATION AND PAYMENT

How Reno Services was paid and in turn how the Reno Services installers were paid was dictated by Section IX of the Contract. (See, Ex. 28, TWC000209) Reno Services installers got paid by the "piece," "by the job" meaning that they got a set rate for each item they installed for TWC. (Reno, 195)

Reno Services installers were dependent on TWC because. "the work schedules for the Reno techs as to how many days they were going to work, where they were going to work, and

8

what location they were going to work was dependant on what jobs Darrell Reno received from [TWC]…" (Morgan, 97)

### iv.) Section XIV, NON-COMPETE

The Contract prohibits Reno Services and its installers from doing any work for TWC competitors. (Ex. 28 TWC000211; Cavender, 251-252)  This includes any digital phone, cable, internet or satellite dish providers.  (Cavender, 251-254)

### v.) Other contract provisions

The Contract also required Reno Services to support "by investing/or leasing required hardware and associated monthly expenses for full field implementation" of TWC's workforce management product, Mobile Force.  (Ex. 28, TWC000214)  TWC was trying to move to a workforce management platform that would eventually be called ARRIS. ARRIS was an electronic method of communicating work orders and their completion using Nextel phone PDA's.  (Cavender, 68-69, Reno, 218-219) Reno Services had to pay for the Nextel phones but TWC set up the direct connect. (Reno, 218-219; 220)

In an effort to comply with all of these Contractual obligations Reno Services issued and updated employment policies.  (See Plaintiffs' Exs. 49, 53, Reno, 222)  It also issued multiple memos to installers reflecting any TWC policy change. (See Plaintiffs' Ex. 54) By comparison, Reno runs his lawn care services very casually without a contract with Time Warner. (Reno, 25-26) By comparison, he has no have any written policies for the employees in his lawn and landscape business, that he does for TWC "[i]t's 'come to work on time, take care of my equipment, here is your [client] list.'" (Reno, 21-23)

9

### 2.) The Work Day and Experiences of Contract Installers

**a.) Plaintiffs report to TWC facilities in the morning, and are dispatched to specific jobs by TWC.**

Contract Installers began their workdays by reporting to one of TWC's Southeastern Ohio facilities. Morgan would call Shawn Taylor "and tell me that Time Warner wants me in whatever office." (S. Taylor, 48) or from TWC; while he was working out of TWC's Athens, Ohio office, Shawn Taylor was told by Athens Supervisor Steve Jones that that he was going to be placed in TWC's Logan, Ohio office. (Taylor, 89) On one occasion, Denney reported to Chillicothe only to find that he had been routed by TWC to Portsmouth. (Denney, 103) Reno would tell Eden Taylor that "Time Warner needed [him]" in a particular location. (Taylor, 37) On one occasion, Keeton asked Morgan for permission to report to the Jackson warehouse, near his residence. The request was denied because Keeton had to report to the location of TWC's choosing. (Keeton, 52)

The workday of Contract Installers, like TWC Techs, began early. Keeton and Eden Taylor were required to be at a TWC office by 7:30 A.M., and Shawn Taylor noted the need to get to the office by 7:00 or 7:30 in order to start on his first job by 8:00 A.M., when the first work order time window opened.[4] (Keeton, 130, 164, E. Taylor, 37, S. Taylor, 49, F. Hoover, 38)

Contract Installers were assigned unique tech numbers just like TWC Techs; the day's work orders would come with printed tech numbers which assigned the job to a particular installer. (Denney, at 30-31, E. Taylor, 82, M. Keeton, 175, Blanton, 46) Work orders with a Contract Installer's tech number would come to whatever facility the Contract Installer was

---

[4] As Eden Taylor noted, "So a lot of times you wouldn't get out of the door until after 8:00 o'clock. Because Time Warner techs tried to get there early too so that they could get their stuff and get out as soon as everybody else."

working from that week. (Denney, 30-31) The work orders contained time windows in which jobs were to be started. (Carter, 59, Denney, 25) Normally the assigned windows were 8:00 AM to 10:00 AM, 10:00 AM to 12:00, and Noon to 4:00 PM, and jobs which needed to be started between 4:00 PM and 7:00 PM. (Carter, 59-60, Keeton, 57, Taylor 57)

After they reported to TWC's facility, TWC assigned plaintiffs to specific jobs by organizing and handing them their assigned work orders. At the main Southeastern Ohio office in Chillicothe, TWC lead technician Dan Reno[5] or TWC's Technical Operations Manager April Blanton would print and organize the work orders. (Carter, 58, Blanton, 44-45, 51) Work orders were divided by Dan Reno or Blanton by assigned tech numbers, then by the normal time windows, and then in the order that made the most geographic sense. (Blanton, 44-45, S. Taylor, 49)

Before heading to their first job, (Contract Installers and TWC Techs) would pick up their necessary "CPE" (Customer Premises Equipment) (Cavender, 166-167) such as converter boxes, cable and phone modems and remotes from TWC. (Denney, 70, J. Carter, 53, Hoover, 38) Contract Installers were required to sign for the equipment in their possession. (E. Taylor, 58-59)

Before they left the TWC facility, Contract Installers were also filled out a "route sheet" with their route for the day. (Blanton, 55 S. Taylor, 49, Denney, 25-26, S. Taylor, 49) The sheet was given to a TWC dispatcher. (S. Taylor, 51, T. Denney, 27) In filling out the route sheet, Contract Installers had some discretion in moving work orders *within time windows* – for example, they could re-organize the order of the jobs which were to be started between, say, 10:00 AM and Noon. (Denney, 26) The proposed routes, however, were subject to review by TWC's Dispatch, which at times would reject the proposed route: "this customer has called in,

---

[5] Dan Reno was Darrell Reno's brother. He is deceased. (D. Reno, 95)

they're not going to be there until twelve, you know, they would like to have this one done first."

(Denney, 27) This was "not really unusual." *Id.*    Plaintiff Shawn Taylor would ask Dispatch if

he could change orders that were within the same time window: "[w]ould it be all right if I went

and done this job?  It's not the first one on my route sheet.  Would it be all right if I done this job

first?" (S. Taylor, 52)

### b)    During the Day, Plaintiffs' Work is Monitored and Supervised by TWC Personnel

Once the route was set, plaintiffs could not change it without permission from TWC

Dispatch:

> A.  You couldn't just change them.  You had
> to approve that with Time Warner.  I mean, if I
> wanted to go do another job, you know, because when
> you're talking about changing jobs, you're talking
> about time frames and everything else.  So you can't
> just go change a job without approving that through
> Time Warner.

(S. Taylor, 51, Keeton, 57) Carter noted that TWC Dispatch once told him "[w]ait until your

time frame." (Carter, 96)  Shawn Taylor testified that if he wanted to call a customer for earlier

arrival, he needed to call TWC for permission.  (S. Taylor, 57)  (It should be noted that Eden

Taylor did not recall needing permission to call a customer and alter the time of arrival)  (E.

Taylor, 53)

Of course, there was no benefit to switching jobs within the same time window: "[i]f you

okayed it with Time Warner, it was okay for you to do.  But that would be really irrelevant to do

because it's an 8:00 a.m. to Noon or whatever time frame it is, it's got to be done in that time

frame.  I mean, it's just about as broad as it is long." (S. Taylor, 53) Regardless of the speed in

which jobs could be done in one time window, the jobs in the subsequent time frame would

remain as scheduled.  When asked if there was a time when he noticed that it might be faster if

he swapped two jobs, Taylor stated "Ma'am, I didn't look at it that way, because the day was going to be the day, you know." (S. Taylor, 52) Eden Taylor noted that if you went too far into switching with your route "you wouldn't make it in to your time frame." (E. Taylor, 40)

When heading to customers homes, Denney recalled that the TWC standard was to call the customers and let them know that he was coming. (Denney, 106-107, E. Taylor, 41) Keeton would usually call customers in advance to make sure they were home; and he would tell them he was with Time Warner Cable; "they [TWC] wanted the customer to know that it was Time Warner that was coming to do their cable, not Joe Schmoe." (Keeton, 69- 70)

When customers were not at home, Contract Installers had to follow TWC procedures. Shawn Taylor and TWC Dispatch would attempt to call the customer, and that the customer's door would be tagged. (Shawn Taylor, 54) Denney noted that if customers did not answer advance phone calls, Contract Installers needed to knock on the door, and wait a period of time before they could leave. (Denney, 107)

Although Contract Installers did occasionally swap work orders with each other during the workday, it was "not very often" (Keeton, 55). Keeton agreed that he might pick up a job when someone had to leave early. (Keeton, 25) Carter noted that "once or twice" routes were only "split" if someone called off and they needed to cover the route. (Carter, 60-61) Jobs Plaintiffs could not cover by swapping were covered by TWC Techs. *Id.*

When work orders changed hands it had to be cleared with TWC Dispatch. (Denney, 24, Carter, 62-63) You could not switch routes "without going through dispatch." (E. Taylor, 80) Denney was denied permission to switch jobs, and Carter noted that, although they didn't say no, Dispatch "suggested" that he not take on any more work. (Denney, 24, Carter, 63) Keeton confirms that Dispatch would not approve swaps if it was a heavy workload day. (Keeton, 56)

Once Plaintiffs finished their last work order for the day, they would call TWC Dispatch to see if they were closed out. (Denney, 78) Eden Taylor would ask TWC Dispatch to see if it was okay to go home:

> Q. You didn't have to call dispatch for
> permission to go home at the end of the day, did you?
> A. We had to close out our work orders.
> Q. Did you ask: Is it okay for me to go
> home now?
> A. Yes.
> Q. Did they ever say no?
> A. If you wasn't cleared out, then you had
> to finish your work.
> Q. What could dispatch have done if you said
> you were leaving?
> A. You would have probably been called into
> the office over that.

(E. Taylor, 72)

At the end of the day, Contract Installers would sometimes find that another job had been added to their workload. (Denney, 78, 96, J. Carter, 107) Denny noted that "Usually, we had to do it." (Denny, 96) Eden Taylor received calls from Dispatch about doing extra work. (E. Taylor, 82) Keeton was asked "three or four times a week" to do an extra job. (Keeton, 84)

On one occasion when Carter needed to leave early, Blanton assigned TWC Techs to some of his remaining jobs, and directed Carter to drive to where the TWC Techs were working and give them the work orders. (Carter, 63-64) If Shawn Taylor had a doctor's appointment, he would ask TWC to route him around the appointment. (S. Taylor, 72) If he needed to leave work early, he would try to find another Contract Installer to pick up the job, but would get approval from Time Warner. *Id.* at 72.

During the work day, Time Warner required Contract Installers to fix jobs which had failed TWC's Quality Control inspections. Director Cavender noted that Contract Installers

14

might be called back to fix QC problems. (Cavender, 121)  (See also:  S. Taylor, 83; J. Carter, 70)  Blanton or the lead TWC Tech would hand Denney a QC paper in the mornings and say "I need you to go back and fix this." (Denney, 36-37)  On one occasion, Denney was told by TWC to fix a QC problem caused by another technician.  *Id.* at 36-37.  Shawn Taylor was required to "go back to a job or two." (S. Taylor, 83)

On one occasion, Keeton and Shawn Taylor were working on a job in which there was an issue with the grounding. (Keeton, 102-103)  They called Blanton, who told them to do the job anyway, even though it would leave the installation ungrounded.  *Id.*

Towards the end of Plaintiffs' time with Reno Services, they were issued hand-held devices which controlled their daily schedules even more tightly.  The PDA system replaced the written work order system. (Keeton, 136)  The system had a set order in which jobs were completed. (Denney, 74-75, M. Keeton, 56)  Jobs could not be changed on the hand-held, and in order to move on to the next job, the job at hand would need to be closed out. (S. Taylor, 68, M. Keeton, 56)

As the TWC contract mandated, TWC controlled the way Contract Installers dressed. For example, in the presence of other installers, Blanton told plaintiff Carter that he was not permitted to wear shorts. (Carter, 83, Denney 60)  Shawn Taylor was told at the Portsmouth TWC office that installers were no longer allowed to wear shorts. (S. Taylor, 81-82)  Blanton required Carter to turn his T-Shirt, which had a logo which she considered to be offensive, inside out. (Carter, 82-83)  At one point, plaintiffs were given TWC hats to wear:

> A: We had a meeting with Time Warner one
> morning.  It was all of Reno, April Blanton was
> there, Jim Cavender was in there.  And I don't know
> the gentleman's name, but he was a, like he was the
> main guy over quality control for Time Warner.
> And they said that we -- just tell them

> that we're Time Warner Cable. And they gave us a hat
> at that time. Time Warner gave us a hat.

*Id.* at 35. (See also: E. Taylor, 52-52, Carter, 36, Denney, 53)

TWC cites, at page 11-12 of its Memorandum, deposition testimony as saying that Reno Services controlled the uniforms the Contract Installers wore. Looking at the pages cited, though, reveals that, as with S. Taylor, 76, Reno Services did not exercise such control, and the wearing of the TWC hat was distinctly recalled.

When he needed a day off, Shawn Taylor asked Blanton. (S. Taylor, at 109) If he asked Darrell Reno for a day off, Reno said he needed to clear it with TWC. *Id.* When Carter needed a couple of days off, he called Darrell Reno. (Carter, 23) Reno told Carter that he would need to have it approved by TWC. *Id.* Reno later called back and told Carter that TWC had approved the day off. *Id.* 23-24.

### c.) Quality Control Inspectors Were Active Supervisors of Plaintiffs' Work

TWC constantly conducted Quality Control ("QC") inspections on plaintiffs work. Denney recalls that QC reviewed the Contract Installer's work; how the drop was run, fittings, neatness, appearance and whether things were grounded to code. (Denney, 41) But the TWC QC Inspection forms is much more detailed. Among the numerous required inspections, the form asks:

> Was Tech in Uniform?
>
> Tech discussed features/benefits
>
> Tech left in packet?
>
> ID badge visible?
>
> Tech arrived on time?
>
> Customer satisfied with service?

16

Customer would recommend TWC?

Was pre-appointment call made?

(Cavender, 115) It also asks 22 separate technical questions, and whether the installer had done "Accurate and Complete Documentation".

In customer's homes, TWC's QC inspectors would sometimes give direct instructions to Contract Installers. For example, Denney was told by TWC QC that he was to drill holes and seal them to keep bugs and air out, and was also instructed on air leakage, drops and grounding. (Denney, 115) QC Inspector Jim Mackan would inspect work while Shawn Taylor was in a customers home, and would give him instructions. (S. Taylor, at 60, 64, 80) Shawn Taylor approximates that a TWC Inspector was present at a customer's house with him between thirty and forty times. (S. Taylor 92-93) TWC supervisor Brad Hall remained for the entire time it took to complete an installation being done by Shawn and Eden Taylor. (E. Taylor, at 65) Hall instructed Eden Taylor how to form a drip loop and affix it to the house. *Id.* at 66. Inspector Mackan observed Shawn and Eden Taylor do a job in Lancaster and "stayed the whole time." *Id.* at 67. TWC lead tech Rusty LNU assisted Eden Taylor with a problem at an apartment complex. *Id.* at 68. Denney noted that in Lancaster, QC Inspectors "followed us around quite a bit to watch how we was, you know, running our drops and how we was grounding the service." (Denney, 114) TWC QC Inspectors would call to see where Denney was on his route, come to meet him, wait until he finished the job and at times follow him to the next. (Denney, 123) Denney remembers TWC QC Inspectors on his job site more than ten times. (Denney, 122) Carter remembers QC Inspector Mackan at his job site three times. (Carter, 94)

More QC's were performed after installations had been completed. (S. Taylor, 92, Denney, 41) There was a box at the TWC office in which Contract Installer's received QC

feedback, like a note in the box from Blanton praising Shawn Taylor for a job he had completed. (S. Taylor, 108-109, Keeton, 109)

In addition to regular inspections by TWC inspectors, Operations Manager Blanton performed at least one QC check per TWC Tech per month. When asked if she tried to do at least one QC check per month for *Contract Installers*, Blanton answered: "I don't remember what criteria, if any, I followed. But I did want to be a ***responsible supervisor*** and check on the work that was being done by others." (Blanton, 101, emphasis added)

Although TWC claims that plaintiffs' actual, and only supervisor (other than Darrell Reno himself) was Carl Morgan, TWC's QC inspection report forms for Plaintiffs lists TWC's Director of Operations "James A. Cavender" as "Supervisor". Cavender said that was "[B]ecause they would work any place within my area and there was no way to assign it to a specific supervisor" (in other words, to a specific ***TWC*** supervisor) (Plaintiffs' Exhibit 30, Cavender, 115-116)

### d.) Other TWC Personnel Gave Instructions to Contract Installers

At the meeting where hats were passed out to Contract Installers, TWC personnel stressed professionalism, demeanor and the importance of passing quality control inspection. (S. Taylor, 35-37) The meeting was conducted by Blanton, Cavender and TWC's main Quality Control Employee. *Id.* Denney remembers the Quality Control employee describing his expectations regarding quality of work. (Denney, 80)

Eden Taylor participated in a conference call with other Contract Installers, in which he was told how to code his work. (E. Taylor, 28) In the winter of 2007, Carter took a written quality control test at the Time Warner Office in Lancaster, Ohio along with other Contract

Installers and TWC employees. (Carter, 75-76) Later, he was told by TWC Inspector Jim Mackan that he had passed the test and that he knew "basically what [he] was doing." *Id.* at 77.

Shawn Taylor and Carter attended a meeting about selling satellite dishes to TWC customers. (S. Taylor, 78, Carter, 77-78) TWC employee Mike Davis told them and the other Contract Installers, as well as TWC Techs, that anyone selling satellites would be terminated. *Id.*

When Keeton ran into a technical issue he had not seen before, he would call TWC Techs or Blanton. (Keeton, at 155-156) If there were technical issues with equipment, Shawn Taylor would call TWC Dispatch. (S. Taylor, 80-81) Dispatch would help with technical issues "to a point", but after they had sent out a certain amount of electronic hits to the equipment Taylor would be transferred to TWC's "Tier 3" technical support. *Id.* When TWC began to offer digital phone service to its customers, Denney was told to call other techs or TWC Dispatch with any phone installation problems. (Denney, 54) Inspector Mackan would call tech support or Tier 3 on Shawn Taylor's behalf if Taylor was having difficulty getting a phone activated. (S. Taylor, 63)

Blanton called Eden Taylor to see "where he was at." (E. Taylor, 56) TWC Dispatch called Keeton if he was running behind, and would ask him how long he expected to be on a job. (Keeton, 168)

### 3. TWC Exercised the Right to Hire and Fire Contract Installers.

Denney interviewed with Darrell Reno for the Contract Installer position. (Denney, 12) At the end of the interview, Reno told him that he would need to run everything by TWC. and that "as long as Time Warner has no problems with it that I had the job." *Id.* at 12-13.

When Eden Taylor was originally hired by Reno, he asked him if he could work only at Chillicothe and Wellston. (E. Taylor, 74) Reno first had to okay the arrangement with TWC.

*Id.* Carl Morgan mentioned to Keeton that "as long as he had the okay" from TWC, he would be hired. (Keeton, 12) Darrell Reno told Shawn Taylor that "I had to clear" through TWC. (S. Taylor, 12)

On Carter's first day of work, he met Blanton at the TWC office. *Id.* at 12. She asked Carter about his experience, and told him that it was a major concern of "theirs" that Darrell Reno hiring people with experience. *Id.* Eden Taylor testified that when he asked Darrell Reno about hiring another Contract Installer, Reno would tell him that he would have to approve it through Time Warner. (E. Taylor, 79)

If you could not work for TWC, you could not work for Darrell Reno. According to Shawn Taylor, "Darrell would all the time tell us that that if Time Warner doesn't want you there, I got to let you go." (S. Taylor, 38)

Denney was initially fired by TWC for taking time off of work because his son was sick. He had called Carl Morgan and told him that he could not work that day because of his son's illness. (Denney, 84-85) That morning, Keeton noticed that Denney was not present. He and Shawn Taylor were told by Operations Manager Blanton to "split up" Denney's route because "we [TWC] had to fire him." (Keeton, 173)

Either Eden Taylor or Keeton called Denney at home and asked what was going on. (Denney, 85) Denney told them that his son was sick, and that he was not going to be there. *Id.* Denney was told that Blanton had said that she had fired him. *Id.* Denney then sent an e-mail to Darrell Reno asking what was going on, and received this response: "***Time Warner has made it clear that if you do not run your route today, that you can no longer work for them.***" (Exhibit 44 to Denney Depo. emphasis added) Reno then told Denney that he would speak to TWC about

the matter. (Denney, 85-86) Denney eventually returned to work for TWC, but was given days off of work. *Id.*

Carter was terminated after he took two days off for his Aunt's funeral. (Carter, 43) Eden Taylor was told by Darrell Reno that Carter was fired, and that Time Warner had "told [Reno] to let him go." (E. Taylor, 78) Morgan also told Shawn Taylor that "Josh Carter was fired because Time Warner told us to get rid of him." (S. Taylor, 38)

### 4. TWC was a Significant Investor in the Equipment and Facilities Used by Contract Installers

In the mornings, TWC Techs and Contract Installer's would pick up their necessary "CPE" or Customer Premises Equipment (Cavender, 166) such as converter boxes, cable and phone modems and remotes. (Denney, 70, J. Carter, 53, Hoover, 38) The equipment was issued daily. (Carter, 53) Of course, TWC Techs used TWC issued supplies and equipment to do their installations. So did the Contract Installers; they would pick up the necessary supplies at the TWC warehouse. (Blanton, 85-87, J. Carter, 55) Supplies used by TWC Techs and Contract Installers to do their work included cable, cable clips, zip ties, electrical tape, bug or bee spray, silicone, and concrete anchor kits. (E. Taylor, 62) Carter remembers using items like compression fittings, connectors, phone line, ground wire and ground clips. (Carter, 52) Shawn Taylor also recalls using "booties", splitters, traps and weather shields. (S. Taylor, 102)

Contract Installers also used some TWC tools. Shawn Taylor was on occasion provided with a hammer drill, masonry bits, and a wall fish kit. (S. Taylor, 44) TWC gave Carter keys to the lock boxes, a "tap tool", a lock box compression fitting tool and a "wall fish kit" (which he borrowed from a TWC Tech). (Carter, 49-50; 53) Eden Taylor borrowed drills from TWC Techs. (E. Taylor, 30-31) Denney used TWC keys and a wall fish kit. (Denney 65-66) Time Warner also supplied the Reno Contract Installers with bucket trucks when needed: If Denney

couldn't reach a pole, he would call a TWC office and they would send a TWC Tech with a bucket truck. (Denney, 113) Occasionally, TWC Tech Dan Reno would bring a truck out to Carter if he needed it in the field. (Carter, 14-15) TWC cited the testimony of E. Taylor, 22, for the proposition that Reno Services provided all the tools Contract Installers needed, but the testimony there does not say that. Similarly, Cavendar, 230, does not there testify to that effect. Even Morgan, 151-52, was not explicit on this point.

### 5. TWC Owned the Property and Facilities where the Contract Installers Worked

Of course, Contract Installers spent the vast majority of their time in TWC's customers' homes (or travelling to and from). Their work days began with Contract Installers reporting to various Time Warner facilities in the TWC Southeastern Ohio region, including Chillicothe, Portsmouth, Athens, Logan, Lancaster, and Jackson. (Carter, 55; Keeton, 75-76, 169; S. Taylor, 89, 91; Denney, 36) As noted, *infra*, Contract Installers picked up their work orders, customer premises equipment and supplies at Time Warner facilities first thing in the morning. At the end of each day, Contract Installers did not go to a Reno Services location, but back to a TWC facility; Operations Director Cavender noted that Contract Installers were to return to the appropriate TWC facility and turn in any unused "CPE" equipment each day. (Cavender, 219-220)

### 6. The Permanency and Exclusivity of the Employment

The contract between Reno Services and TWC, was a "standard" agreement created by TWC, was not subject to negotiation. (Cavender, 135-135) Darrell Reno "absolutely" wanted his employees to comply with the contract. (Reno, 148) He explained in a letter to Plaintiffs that he would lose his contract if there were too many failed jobs, which would result in the loss of the Contract Installers' jobs. (Morgan 192-193, Exhibit 54) Carl Morgan agreed that if Darrell Reno

22

lost his Time Warner contract, he would have no other places to put the contract installers, and they would be out of work. (Morgan 192-193)

Not only were the Contract Installers subject to the myriad details and requirements of the Time Warner contract (See *infra*) Time Warner controlled the employment possibilities of the Contract Installers, and even its own *former* installation techs. If an installation company like Reno Services wanted to employ a former TWC Tech, the Tech could not do Time Warner installations if they left Time Warner other than on "good terms". (Cavender, 250-252) This meant that the installer could not do any cable, internet, digital phone or satellite dish installations, because by the terms of the standard contract, contracting companies are not permitted to work for competitors (e.g. Horizon or Dish Network or Digital Dish) (Cavender, 251-251) Likewise, Contract Installers are not permitted to do any work for competitors who install internet, phone and cable, if they are engaged doing Time Warner installations. (Cavender, 252-253)

Contract Installers were also restricted because of their working hours. Plaintiffs worked long hours performing installations for TWC. This can plainly be seen from days beginning before the 8:00 AM window, an ending after a 4 PM to 7 PM evening window. Plaintiffs worked six days per week, including Saturdays. (Keeton, 183, S. Taylor 101) Michael Keeton explained that he worked six days per week and was usually on his way to his first job at 8:00 am and would not finish until 6:00 pm or 7:00 pm, sometimes as late as 9:00 pm or 10:00 pm. (Keeton 182-183) While Plaintiffs were theoretically available to perform other work during the time they were not performing installations for TWC, they would not have had time to do so. As Eden Taylor explained:

> Q. Did you ever have time to do any other
> Kind of work?

A. Very, very seldom. Other than on Sundays.
Q. What did you do on Sundays?
A. Usually mow my grass, spend time with my family.
Maybe go down to a buddy's house and work on
Some vehicles or something like that on a weekend.

(E. Taylor, 18)

### 7. Contract Installers Could Not Control Profit and Loss

According to the TWC contract, Reno Services is paid a flat rate for piecework performed by the Contract Installers. (See *infra*) Certain types of jobs have higher pay than others. (See *infra*) As noted above, Darrell Reno sought an increase in the pay rate, but there was "no negotiation" possible with TWC. (Cavender, 134-135) Contract Installers typically worked from 7:30 or 8:00 AM "to whenever the last job was completed". (Reno, 193) (See Section (A)(6) above) Their pay was dependent on the type of jobs that they were assigned. (Keeton 177-178) As Keeton put it, "Never had an opportunity to pick what you wanted. You did what they gave you." *Id.* Turning down a job meant that the Contract Installers would lose money as that was how they were paid. (S. Taylor 76) Similarly, if a customer was not home and the Contract Installer was unable to perform the work, they would not be paid.

TWC controlled the amount of work that the contract installers received. As described in *infra*, the printed work orders with assigned tech numbers were simply handed to the Contract Installers. (See generally: Blanton, 41-54) Daily, it was up to TWC whether or not the contract installers got more work. Denney testified that he could call TWC Dispatch to try pick up more jobs, but that TWC Dispatch could tell him no. (Denney 117) When there was extra work TWC would divide up extra work and reassign the work orders in the computer. (Denney, 94-95)

As noted in *infra*, the TWC contract provides for penalties and back-charges. Operations Manager Blanton expected Reno Services to "correct it or they would be back charged."

24

(Blanton, 110-111) Reno could be penalized, and if he was, he would take it out of his installers

pay. (Reno, 237-239) Michael Keeton explained that it ultimately came out of his pocket.

(Keeton 105-106) Shawn Taylor was instructed to return and correct several jobs for which

there is no pay. (S. Taylor 83)

### 8. Job Training was Minimal and some of it was done by TWC

The training new Contract Installers received from Reno Services, Inc. was minimal. For

Example, Plaintiff Carter "rode along" with Plaintiff Eden Taylor for a short time. (Carter, 54)

Eden Taylor trained other Reno installers. (E. Taylor, 29)

Likewise, Time Warner provided very modest training to the CI's. When digital phone

launched, Carter accompanied a TWC Tech on an installation run to see how installation were to

be done. (Carter, 47-48) Eden Taylor received a small bit of training from TWC Techs when he

began working for Reno Services: "Just Time Warner techs, I mean the day I went into the office

they told me, you know, they told me what I had to do and showed me my paperwork, showed

me, you know, like the codes on it, DCT, they showed me what that was and stuff like that." (E.

Taylor, 26) Blanton conducted a conference call with the Reno Contract Installers during which

she discussed how to code the work. (E. Taylor, 28) Denney also recalls the contract installers

being pulled into a training meeting regarding phone installations, and that Time Warner also

showed them how to run "drops with power." (Denney, 55)

TWC cites at page 13 of its Memorandum testimony purporting to establish that Reno

Services was solely responsible for training. The testimony actually reflects that Contract

Installers were given some training by TWC and attended workshops at TWC. E. Taylor, 27, 29

(conference call with TWC Blanton); Denney, 51-55 (TWC training room and mock telephone

installation demonstration); Denney, 81-82 (attended training session of TWC Techs). Some of

25

the testimony cited by TWC simply does not say what TWC reports. *See* E.Taylor, 27, 29;

Keeton, 30-31, 126; Denney, 21-22, 35, 40, 51-55, Carter, 54-55.

## III.   ARGUMENT

### A.   A Totality of Circumstances Standard Determines Whether TWC Is a Joint Employer under the FLSA.

The FLSA uses an extremely broad definition of employer, rejecting the restrictive

common-law definition of an employer. *Anterior v. D & S Farms*, 88 F.3d 929, 929 (11th Cir.

1996) ("In defining 'employment' under [the FLSA], Congress expressly rejected the common-

law definition of employment, which is based on limiting concepts of control and

supervision.")(citations omitted). *See also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318,

326 (1992) ("suffer or permit to work" formulation "stretches the meaning of 'employee' to

cover some parties who might not qualify as such under a strict application of traditional agency

law principles").

Thus, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more

broadly than the term would be interpreted in traditional common law applications." *McLaughlin

v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (*per curiam*).   This canon of statutory

interpretation applies full force to a determination of joint employment. *Real v. Driscoll

Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) (In joint employment cases "[c]ourts

have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under

the FLSA, in order to effectuate the broad remedial purposes of the Act.").

Under 29 U.S.C. § 203(g), an employer is an entity which "suffers or permits" an

employee to work.   This is "'the broadest definition [of 'employ'] that has ever been included in

any one act,'" *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945) (quoting 81 Cong.

Rec. 7657 (1937) (statement of Sen. Hugo L. Black), and it encompasses "working relationships,

which prior to [the FLSA], were not deemed to fall within an employer-employee category,"
*Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947).

An "economic reality" standard is used. *Goldberg v. Whitaker House Coop., Inc.*, 366
U.S. 28, 33 (1961). *Accord United Stated Dept. of Labor v. Cole Enter., Inc.*, 62 F.3d 775, 778
(6th Cir. 1995). That standard depends on the totality of the circumstances, and "***any relevant***
***evidence may be examined*** so as to avoid having the test confined to a narrow legalistic
definition." *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2nd Cir. 1999) (emphasis
noted).

The overall goal "is to determine whether the employees in question are economically
dependent upon the putative employer." *Lopez v. Silverman*, 14 F.Supp.2d 405, 414 (S.D.N.Y.
1998). Thus, the determination of an employment relationship "does not depend on . . . isolated
factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v.
McComb*, 331 U.S. 722, 730 (1947). While control over the employee remains a critical factor,
the FLSA definition of employee and this precedent on its interpretation transcends control and
looks far more broadly. Control is, therefore, one and only one circumstance in the totality of the
circumstances.

Court have listed, but have not limited, relevant factors, and these are captured in the
Eleventh Circuit's Pattern Jury Instruction 1.10.42, derived in large part from *Anterior*, 88 F.3d
at 832:

> The "economic realities" test in that instruction examines the
> following factors: (1) the nature and degree of control of the employee,
> and who exercises that control; (2) the degree of supervision, direct or
> indirect, of the employee's work, and who exercises that supervision; (3)
> who exercises the power to determine the employee's pay rate or method
> of payment; (4) who has the right, directly or indirectly, to hire, fire, or
> modify the employment conditions of the employee; (5) who is
> responsible for the preparation of the payroll and the payment of wages;

27

(6) who made the investment in equipment and facilities used by the employee; (7) who has the opportunity for profit and loss; (8) the permanency and exclusivity of the employment; (9) the degree of skill required to do the job; (10) the ownership of the property or facilities where the employee works; and (11) the performance of a specialty job within the production line integral to the business.

The Department of Labor has promulgated regulations that explicitly recognize joint employment. 29 C.F.R. § 791.2. Again, the totality of the circumstances controls: "A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon *all the facts in the particular case*." 29 C.F.R. § 791.2(a) (emphasis noted). The regulation hypothecates two contrasting situations:

> If all the relevant facts establish that two or more employers are *acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee*, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act. On the other hand, if the facts establish that the employee is employed jointly by two or more employers, *i.e.*, that *employment by one employer is not completely disassociated from employment by the other employer*(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act.

*Id.* (emphasis supplied). The "joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek." *Id.* Thus, even though each of the joint employers is a separate business entity, the relationship to their joint employees is governed by the FLSA. *See, e.g., Skills Dev. Serv., Inc. v. Donovan*, 728 F.2d 294, 300 (6th Cir. 1984) ("[A] worker may be jointly employed by two entities, each of which is responsible for complying with the [FLSA].").

The Department of Labor regulation also considers work "which simultaneously benefits two or more employers" and provides that "a joint employment relationship generally will be considered to exist in situations such as: (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(1)-(3).

The factors used in other appellate circuits parallel those quoted above. *See, e.g., Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir.1997) ("Other relevant factors include (1) whether the service rendered requires a special skill; (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes; (3) whether the premises and equipment of the employer are used for the work; (4) whether the work was piecework and not work that required initiative, judgment or foresight; (5) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill; (6) whether there was permanence in the working relationship; and (7) whether the service rendered is an integral part of the alleged employer's business."). At bottom, any factor which a jury could reasonably consider in determining the nature of an individual's relationship to the alleged joint employer is germane.

The fact that TWC used independent contractors to control in part the Contract Installers is not dispositive. In *Rutherford Food Corp.*, 331 U.S. at 726, the independent contractor hired

and fired, set hours, and paid his employees. Based on the "circumstances of the whole activity," *Id.* at 730, the Court found the alleged employer to be a joint employer. Key factors included the extent to which the alleged employer's managers closely monitored or supervised the independent contractor's employees; the opportunity those employees had to work for other employers than the alleged employer; the way the alleged employer controlled the employees' work schedules; and how integral the employees' job performance was to the alleged employer's operations. *Id.* at 736.

A functional measure was taken, and a subterfuge to evade the FLSA and other labor laws exposed. Of particular note at bar, *Rutherford*, 331 U.S. at 729, explained that labels do not control: "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act."

Necessarily, the totality of the circumstances approach is factual intensive. After all, determining of "joint employer [status] is essentially a factual issue." *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No.1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902 (6th Cir. 1991).

TWC flatly states, however, that its joint-employer status presents a question of law. It cites authority for the proposition that whether an employer is covered by the FLSA is such a question. What TWC missed is what the totality of circumstances standard in the Department of Labor regulation and the case law makes abundantly clear: "Subsidiary findings, however, are considered issues of fact." *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1318 (S.D.Fla. 2001).

Even Courts that have proclaimed an employer's status to be a question of law have recognized that "[t]he joint employer determination requires a fact intensive inquiry into the relationship between [the two employers] for the purpose of applying the 'economic reality

30

test.'" *Zhao v. Bebe Stores, Inc.*, 247 F.Supp.2d 1154, 1155 (C.D.Cal. 2003). Summary judgment may not be granted because the Contract Installers have demonstrated "the existence of genuine factual issues concerning whether [TWC] an 'employer' of [them], within the meaning of the FLSA." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir.1979).

In this sense, the phrase "essentially a factual issue," *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964), more accurately captures the dynamic of the totality of circumstances standard. *Accord Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983) ("Whether a party is an employer or joint employer for purposes of the FSLA is essentially a question of fact[.]"). While "the legal effect of those facts -- whether [the defendants] are joint employers within the meaning of the FLSA -- is a question of law," *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986), genuine issues of material fact about the actual interrelationship between TWC and independent contractors preclude determining that question of law on summary judgment.

Many of these factors are superficially consistent with a *bona fide* independent contractor relationship. The Contract Installers allege, though, that unlike *bona fide* independent contractors who repaired TWC's computers, mopped its office floors, or serviced its vehicles, they performed the same duties in the same way, but for denial of overtime, as its employees. *See Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 408 (7th Cir. 2007) ("[A] firm hired a single person to supply a labor force rather than a defined product (such as a working elevator or a legal brief) [which is different from] a distinct activity -- for example, plumbing repairs - conducted by an independent contractor who appears, does a discrete job, and leaves again.").

A totality-of-circumstances approach necessarily involves bits and pieces of circumstantial evidence that point in contrary directions: "In entertaining and assessing the

31

evidence relevant to the inquiry called for by a given factor, the question the district court must ask itself is whether such evidence, considered as a whole, supports (or fails to support) the laborer's claim that he is economically dependent on the putative employer[.]" *Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) (footnote omitted). The analytical process parallels how circumstantial evidence is customarily handled: "The facts the court finds at the end of each inquiry become pieces of circumstantial evidence which, together, yield inferentially one of two ultimate facts: joint employment exists or it does not." *Id.* *Accord* 29 CFR § 825.106(b)(1) ("A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality.") (Family and Medical Leave Act using FLSA standards).

TWC uses a classic divide and conquer approach to undermine the totality of the circumstances by isolating and then diminishing the significance of each individual piece of evidence. Circumstantial evidence intrinsically operates, however, in synergistic fashion. As the Court observed in *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987), "Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."

In *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the Court reaffirmed the *Bourjaily* equation for measuring circumstantial evidence under the reasonable-suspicion standard of the Fourth Amendment: "The [appellate] court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of circumstances' as our cases have understood that phrase [which] precludes this sort of divide-and-conquer analysis." TWC obscures the synergism from *Bourjaily*, 483 U.S. at 179-80, and the overall

question posed by the Department of Labor Regulation: whether "employment by one employer is not completely disassociated from employment by the other employer." 29 C.F.R. § 791.2(a).

*Arvizu*, 534 U.S. at 274-75, rejected an approach that considered a possible innocent explanation for each of the circumstances an officer considered and adopted an approach that considered the circumstances cumulatively. A cumulative approach at bar operates in the same way. Ultimately, "[t]he basis of the joint employer finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997). "Thus, the 'joint employer' concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment." *Id.*

### B.     On the Voluminous Facts Developed by the Contract Installers Summary Judgment May Not Be Granted to TWC.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). *Accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340

(6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At most, what TWC could argue (and the facts adduced by the Contract Installers specifically refute) it has shown is that "this is a case that on its facts could go either way." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 578 (6th Cir. 2003)(*en banc*). TWC's motion must, therefore, be denied because "[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment in the case before us." *Id.*

"The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Wexler*, 317 F.3d at 570 (quoting *Anderson*, 477 U.S. at 251-52). In addressing that issue, the focus is not on resolving factual questions but rather on determining if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). In making that determination a court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249; *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

Consequently, all the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001). This preference for jury resolution of questions of fact extends to denying summary judgment when the moving party's materials

34

contain "unexplained gaps" pertinent to the material issues of fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-60 (1970).

A material fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). *Accord Anderson*, 477 U.S. at 248.

On the material facts relevant to the totality of circumstances, the Contract Installers have produced far, far more than a scintilla of evidence. *Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). Rather than "rely merely on allegations or denials," they have "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

### 1. No Single Factor in the Totality of the Circumstances Is Dispositive.

The Contract Installers do not rely on any one circumstance in the totality. They recognize, for example, that TWC's inspection of their work and specifications for its performance are consistent with an independent-contractor relationship. *See, e.g., Santelices*, 147 F.Supp.2d at 1327. In contrast, upon evidence that TWC "checked the work on a daily basis, gave work commands or otherwise intervened in the performance of the installers' duties, on a daily basis or anytime," joint employment, rather than "minimal oversight" is involved. *Id.* The record at bar is not reflective of "minimal oversight."

The totality of the circumstances yields an inference on whether individuals labeled independent contractors are "much more akin to wage earners toiling for a living" with "little ability to influence [their] profit or loss." *Mendoza v. Essential Quality Constr., Inc.*, 691 F.Supp.2d 680 (E.D.La. 2010) (construction workers sued both the independent contractor,

35

which was a subcontractor to a general contractor, and the general contractor). The genuine issue concerns the individual's relationship to the putative joint employer, not whether that employer or an independent contractor exercises the most control. Greater control by the independent contractor does not "preclude the possibility of an employment relationship with the other." *Id.* at 685-86.

How integral what the Contract Installers did was to TWC's operation is a good example of a factor that could be argued either way. TWC claims that independent contractors often perform essential duties for a principal, and reliance on an independent contractor ought not matter. *Rutherford* and lower court precedent treat this as a factor, though, under the reasonable assumption that an employer would want its own employees to perform essential duties or at least to jointly supervise any employees who did so.

The fungibility of TWC Techs and Contract Installers supports that precedent. TWC had its own employees performing the same duties in largely the same way as the Contract Installers. They were interchangeable. A TWC Tech could pick up an assignment that a Contract Installer failed to complete and vice-versa. In the language of *Rutherford*, 331 U.S. at 729, "the work done, in its essence, follows the usual path of an employee." Therefore, "putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Id.*

A reasonable juror could infer from this factor a joint-employment relationship and combine that inference with inferences reasonably drawn from application of the other factors to corroborate that inference. In the totality of circumstances reflected on the evidence, this Court would not displace that verdict by adopting TWC's claim that as a matter of law the inferences did not add up to a joint-employment relationship.

2. **TWC Insinuated Itself So Far Into the Performance of the Contract Installers' Job Duties that It Became a Joint Employer under the FLSA.**

The Contract Installers have adduced evidence that TWC had the discretion to exclude any employees of Reno Services from performing duties under the contract with TWC. The "economic reality" of that discretion was that any employee of Reno Services whom TWC did not want would be terminated. Most revealing are the note sent by Reno Services' manager to a Contract Installer -- "Tom, at this point in time, it is not up to me if you still have a job or not. Darrell [Reno] waiting to see what Time Warner has to say." – and the way Plaintiff Denney's need to be off work because his son was very sick was handled by Reno Services: "*Time Warner has made it clear that if you do not run your route today, that you can no longer work for them*." (Exhibit 44 to Denney Depo. emphasis added)

Were a true independent-contractor relationship created, Reno Services would control which employees to hire, assign, discipline, and terminate and TWC would have evaluated its contract with Reno Services based on how well those employees performed. Indeed, TWC had a penalties provision in the contract with Reno Services and could have meted out those penalties were it dissatisfied with how the employees of Reno Services performed. TWC also had the right to cancel its contract with Reno Services for inadequate performance. Principals and independent contractors which are not joint employers use such provisions. TWC did not rest, though, on such power a principal has over an independent contractor and instead interacted the way a joint employer would.

At bar, TWC effectively controlled which employees Reno Services had. TWC cites *Jacobson v. Comcast Corp.*, 2010 WL 3769120 *4 (D.Md. 2010) (footnote omitted), for the proposition that "[i]t is only in the context of quality control, however, that Comcast exercises

power over the hiring or firing of technicians." The relevant question, however, is not *why* the putative joint employer "exercises power over the hiring and firing," but *whether* it does so.

The Contract Installers are willing to assume for purposes of this motion that TWC always had a justification for its exercise of discretion over Reno Services employees. The fact that it exercised that discretion is what yields an inference of joint-employer status.

The footnote in *Jacobson*, 2010 WL 3769120 *5, excepted from its ruling on drug and security screenings one branch office which proclaimed the right to control who was hired by the independent contractor. As a practical matter, TWC could exercise just such control because its contract reserved the right to delay or deny the required screenings. TWC could withhold approval of a new hire by Reno Services so long as it wanted. Rather than impose drug and security screening duties on Reno Services which Reno Services would then perform to its own satisfaction, TWC reserved for itself the final say on those screenings. In other words, TWC used Reno Services as a personnel manager or human resources department in a hierarchy that reserved the final decision to TWC.

As an empirical matter, Reno Services was emphatic: a Contract Installer could not be hired if TWC did not want him or her. The grounds that TWC had transcended drug and security screening. TWC wanted Contract Installers with experience in the field. Beyond that, the number of Contract Installers Reno Services could hire was also fixed by TWC.

The amount of experience a Contract Installer should have was even problematic. Independent contractors typically bring a special skill set to the table. The principal may have entered into that contract precisely because of that special skill set. Individuals with a special skill set presumably may enter the marketplace and sell that skill to others than the principal.

38

Contract Installers received, however, barely any training, and much of it was on TWC's coding and related paperwork. The actual installation – mainly digging, hanging, and connecting -- was hardly rocket science. The relatively low rate paid suggests a comparably low skill set, and the way hiring and training was done confirms that suggestion.

*Jacobson*, 2010 WL 3769120 at *5, stressed that "Comcast is not responsible for the day-to-day management of the technicians. Comcast has no role in developing the Installation Company's human resource policies and does not dictate the technicians' working conditions, or determine the conditions upon which the technicians' would receive payment." However "substantial in degree" its "supervision and control may appear," its interaction was "qualitatively different from the control exercised by employers over employees." *Id.* at *6.

At bar, TWC's supervision and control of Reno Services' employees parallels in all material aspects "the control exercised by employers over employees." When questions arise on the job, the call that counts is to TWC. When assignments are made or modified, TWC dispatches. When field supervision is done, a TWC Quality Control inspector is likely to be the one doing it. This is not mere quality control, this is joint employment.

Under the contract, TWC mandated that Contract Installers "have direct communications" with it. TWC did not go through management or supervisors at Reno Services when it wanted to control Contract Installers; instead, it insisted on those "direct communications" in the same way that any supervisor of an employee would communicate.

A day in the life of a Contract Installer illustrates the degree of TWC's control. The day began at TWC's office, not at Reno Services' office. TWC would sometimes even direct the Contract Installers to which of its branches they should report, routing them according to its needs in just the way a supervisor of an employee would.

Early in the morning when the Contract Installer reported to TWC's office, it was TWC, not Reno Services, which assigned the work orders for that day. And those work orders had specific time windows that TWC controlled. TWC employees received orders in the same way.

While TWC argues that Reno Services or the Contract Installers provided the equipment, such as basic tools and a transportation vehicle, the Contract Installer could not leave TWC's office before securing the necessary Customer Premises Equipment. They would also use special tools borrowed from or supplied by TWC. When a bucket truck was needed, TWC supplied it.

The Contract Installer had to complete a route sheet and submit it to a TWC dispatcher. Again, the dispatcher was not a Reno Services director of employee movement, but rather a TWC dispatcher. The TWC dispatcher would review and reject routes depending on TWC's view of how best to perform the requisite services. TWC made quality control inspections and then it, not Reno Services, assigned Contract Installers to fix any problems.

As the Contract Installer went from customer to customer, it was the TWC dispatcher whom the Contract Installer had to call to be cleared. When a customer was initially not at home, it was the TWC dispatcher who later called the Contract Installer to return to the home. What Contract Installers could wear and how they should act was also dictated by TWC. For a short period they were even given hats with a TWC insignia, a natural "mistake" by TWC supervisors who viewed them the same way they did the TWC Techs.

No route could be changed without approval from TWC. The Contract Installer could not unilaterally initiate communication with a customer to reschedule a timeframe; TWC insisted on approving such contact. TWC checked in with the Contract Installer to see how long a job was taking.

The Contract Installers were, moreover, interchangeable with TWC Techs. When service took much longer than anticipated or an installer called off, these two groups of employees were fungible. TWC controlled, though, any swapping of assignments, whether among Contract Installers or between them and TWC Techs.

The day ended only when TWC said it did. The Contract Installer had to call the TWC dispatchers to close out work orders, and extra work would often be assigned to them by a TWC dispatcher. If a Contract Installer wanted to leave work early, it was TWC that controlled that decision and any reassignment to ensure completion of work orders. Even a day off had to be cleared with TWC; Reno Services could not make that decision about the Contract Installers.

That day ended after exhaustive hours. The notion that Contract Installers were independent contractors who could work for other principals than TWC is belied by TWC's assignments: six days a week, more than ten hours a day. The irrefutable economic reality is that Contract Installers depended on TWC exclusively and could not realistically take on other significantly remunerative work.

TWC's quality control surpassed technical job performance, *i.e.*, was the cable properly installed and the equipment working well. The detail is revealing, it extended to every aspect of job performance from uniform to method of performing the job duties. TWC's Quality Control inspectors in the field interacted with Contract Installers, directly supervising them on how to perform their jobs, and the inspections were often made. Under the guise of quality control, the inspectors exercised supervisory power identical to that of an employee's supervisor.

TWC's own records designate its Southeastern Ohio Director of Operations as the Contract Installers' supervisor. His explanation for that designation was that the geographic breadth of assignments for Contract Installers precluded assigning them to a specific supervisor.

41

In context, his testimony equated field supervisor with Quality Control inspector. When Contract Installers met with TWC management, the Quality Control inspectors sounded like supervisors in describing their expectations, and that sound was heard in the field when they implemented those expectations. A jury must determine whether TWC used nomenclature in order to circumvent proof that it actually supervised Contract Installers.

The Department of Labor Regulation, 29 C.F.R. § 791.2(b)(1)-(3), finds joint employment "[w]here one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee." TWC had just such a daily interaction with the Contract Installers. TWC dispatchers, office supervisors, and so-called Quality Control inspectors acted "in the interest of" Reno Services by assigning and directing the job performance of the Contract Installers.

As with TWC's exercise of discretion over whom to hire or fire, there may have been ample business justification for TWC to control Contract Installers in the same way it did TWC Techs. It is no doubt efficient to have Contract Installers report to the TWC office, secure their assignments, routes, and essential equipment there, be in constant contact with and subject to direction from TWC dispatchers, use TWC management to answer questions and resolve problems, and receive direct, ongoing field instruction from Quality Control inspectors. TWC wanted the job done when and how it wanted it done.

But a joint employer differs from a principal interacting with an independent contractor because the former effectively becomes the employer while the latter entrusts to the independent contractor the choice of means to attain the required ends. In a true independent contractor relationship, the principal establishes the outcome, such as TWC's specifications for installing cable, and entrusts to the independent contractor control of its employees to accomplish that

outcome. In a joint-employer relationship, like the one at bar, the putative joint employer exercises that control.

Alternatively, the Department of Labor Regulation finds joint employment "[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." Sufficient indicia of the requisite interaction have been submitted to this Court to create a genuine issue of material fact on this standard for joint employment. TWC and Reno Services were "not completely disassociated with respect to the employment of" Contract Installers; they were inextricably integrated.

> **3. TWC's Emphasis on Separate Corporate Existence Addresses a Threshold Premise for Joint Employment and Does Not Refute a Genuine Issue of Material Fact Given the Nature of the Detailed Control TWC Had.**

TWC stresses that "Reno Services LLC ("Reno Services") [is] a completely independent company that employed Plaintiffs." On the facts, Reno Services was a virtually dependent company on TWC. Regardless of Reno Services' separate identity, its employees were at TWC's beck and call, under regular supervision, and performed nearly identically to TWC's employees. Reno Services was a captive company. It had zero negotiating room about the tremendously extensive contract with TWC and risked its very existence on TWC's business.

TWC cites authority, though, for the proposition that "detailed instructions and close monitoring are key components in many independent contractor and franchise relationships." *Jacobson*, 2010 WL 3769120 at *8. In turn, *Jacobson* cited an earlier decision from the same District. *Herman v. Mid-Atlantic Installation Serv.*, 164 F.Supp.2d 667, 672 (D.Md. 2000) (Comcast's policy "requiring the Installers to meet ... installation specifications is entirely

43

consistent with the standard role of a contractor who is hired to perform highly technical duties").

The syllogism urged by TWC is straightforward: (1) Details specify what an independent contractor must do; (2) Independent contractors are exempt from the FLSA; and (3) therefore, Details do not prove a joint-employment relationship. The Devil is, however, in the details. The syllogism is vacuous without scrutiny of those details. Consider the franchisor offering a turn-key operation selling hamburgers, fries, and shakes. To maintain quality control and brand loyalty, details on preparing and serving the fast food will be imposed. But the franchisor does not then routinely assign its employees to tasks being performed by the franchisee's employees, supervise, or otherwise interact the way TWC and its contract operates.

The illustration of detailed specifications for "highly technical duties," *Herman, supra*, leads to the same conclusion. When a defense contractor building a stealth bomber secures a subcontractor for the engine and another for the electronics, the detailed specifications are gargantuan. The rest of the detail reflected in TWC's control over its "independent contractors" is absent. Once the putative joint employer goes beyond the quality control inherent to technical specifications and insinuates itself into the day-to-day operations of the "independent contractor," its reliance on the syllogism TWC asserts rings hollow.

TWC even controlled when Reno Services could identify itself as an independent business. Thus, the captivity extended to negating the identity of the "independent contractor," another sign that the arms-length business operations TWC touts to distance itself from Reno Services was actually a bear hug.

The economic reality of that grasp is best illustrated by TWC's threat that any Contract Installer who also sold satellites would be terminated. TWC and Direct TV are profound

44

competitors, but true independent contractors would owe no duty of loyalty to a principal beyond performing their duties up to spec. TWC went beyond the immediate market an independent contractor would serve and sought to regulate the secondary market an independent contractor might enter. Its contract with Reno Services explicitly prohibited working for any competitors. Consequently, Contract Installers had the duty of loyalty employers impose on their employees rather than the freedom of access to the marketplace independent contractors typically enjoy.

TWC argues, though, that even a captive company is "perfectly consistent with a legitimate subcontracting relationship." *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2nd Cir. 2003). The reason such captivity is a factor is "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arraignment than a subcontractor that serves a single client." *Id. Jacobson*, 2010 WL 3769120 at *7, adopted the divide-and-conquer approach to this factor: "The record establishes that the Installation Companies work primarily, if not exclusively, for Comcast. However, by itself, the absence of a single client base is not a proxy for joint employment[.]"

Nearly all the factors in the totality of circumstances standard are not by themselves "a proxy for joint employment." The synergy of circumstantial evidence rejects that divide-and-conquer approach because it undervalues probity. A reasonable juror could conclude that the fact that Reno Services was TWC's captive makes it more likely TWC exercised the control of a joint employer in light of the other evidence. Under Fed.R.Evid. 401, that is all evidence need do to be admissible, and under Fed.R.Civ.P. 56, such weight and credibility determinations are for the jury and must not be made in deciding a summary judgment motion.

What most weakens *Jacobson* as authority is the factual record developed at bar on the nature and extent of the control exercised by TWC and its role in day-to-day management. On

top of that, the *Jacobson* District Court's approach to summary judgment is decidedly not the one taken in the Sixth Circuit. *Jacobson*, 2010 WL 3769120 at *8, ended its decision by explaining: "In sum, although the issue is not free from doubts, I conclude that Comcast is not Plaintiff's joint employer within the meaning of the FLSA." In the Sixth Circuit, unless the facts are so *one-sided* that a judge should displace a jury determination of them, summary judgment may not be granted. *Wexler*, *supra*.

IV.    **CONCLUSION**

Under the Department of Labor Regulation, 29 C.F.R. § 791.2(a), to secure summary judgment TWC must establish with "all the relevant facts" that it and Reno Services were "acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee." The evidence before this Court instead establishes that TWC and Reno Services were acting entirely *inter*dependently and were closely associated with respect to Contract Installers.

Summary judgment should not be granted on such specific evidence because TWC has not simply contracted with Reno Services to perform cable installation duties. Instead, TWC has regularly exercised wide-ranging control over Reno Services' employees.

46

Respectfully submitted,


By */s/ John S. Marshall*
John S. Marshall (0015160)
*(jmarshall@marshallandmorrow.com)*
Edward R. Forman (0076651)
*(eforman@marshallandmorrow.com)*
 MARSHALL AND MORROW LLC
111 West Rich Street, Suite 430
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780


Robert DeRose (0055214)
*(bderose@bnhmlaw.com)*
Robert K. Handelman (0019589)
*(bhandelman@bnhmlaw.com)*
Kate Stone (0085600)
*(kstone@bnhmlaw.com)*
BARKAN, NEFF, HANDELMAN, MEIZLISH, LLC
360 South Grant Avenue
P.O. Box 1989
Columbus, Ohio 43216-1989
(614) 221-4221
Fax: (614) 221-5808

Attorneys for Plaintiffs

**OF COUNSEL:**

Louis A. Jacobs (002101)
*(LAJOhio@aol.com)*
66871 Rayo del Sol
Desert Hot Springs, California, 92240-1871
(614) 203-1255
Fax (760) 288-2146

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties, by email transmission on this 18th day of February, 2010.


By */s/ John S. Marshall*
John S. Marshall (0015160)

47